IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CANDACE WATTS HERSHBERGER, | ) | CASE NO. 5:25-CV-02268-PAG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Candace Watts[1] ("Plaintiff" or "Watts"), challenges the final decision of Defendant, Frank Bisignano,[2] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In June 2022, Watts filed applications for POD, DIB, and SSI, alleging a disability onset date of May 24, 2022, and claiming she was disabled due to lower sciatica problem, lower lumbar damages, bipolar

[1] As the parties refer to the Plaintiff as Candace Watts (Doc. Nos. 7-8), the Court refers to her that way throughout this Report and Recommendation.

[2] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

disorder, chronic acidities, urinary incontinence, restrictive lung disease, supraventricular tachycardia, severe depression, body aches, carpal tunnel syndrome, and skin ulcers. (Transcript ("Tr.") 135, 180.) The applications were denied initially and upon reconsideration, and Watts requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 180.)

On August 2, 2023, an ALJ held a hearing, during which Watts, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On September 27, 2023, the ALJ issued a written decision finding Watts was not disabled. (*Id.* at 180-91.) Watts filed a Request for Review of the ALJ's Hearing Decision with the Appeals Council. (*See id.* at 199.) On September 25, 2024, the Appeals Council issued a Remand Order directing the ALJ to offer Watts a new hearing. (*Id.* at 197-202.)

On March 6, 2025, an ALJ held a new hearing, during which Watts, represented by counsel, and an impartial VE testified. (*Id.* at 17.) On April 4, 2025, the ALJ issued a written decision finding Watts was not disabled. (*Id.* at 17-30.) The ALJ's decision became final on August 20, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On October 21, 2025, Watts filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7-8.) Watts asserts the following assignment of error:

> (1) THE ADMINISTRATIVE LAW JUDGE'S FINDINGS AND CONCLUSIONS CONCERNING THE PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

(Doc. No. 7 at 11.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Watts was born in October 1979 and was 45 years old at the time of her March 2025 administrative hearing (Tr. 17, 28), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§

404.1563(c), 416.963(c). She has at least a high school education. (Tr. 28.) She has no past relevant work. (*Id.*)

**B. Relevant Medical Evidence**[3]

An MRI of the lumbar spine taken on June 24, 2021 revealed mild developmental narrowing of the lumbar spinal canal and spondylosis, most pronounced at L5-S1, no high-grade spinal canal stenosis at any level, lower lumbar degenerative facet arthropathy and grade 1 anterolisthesis of L5 on S1, and "[s]evere left greater than right foraminal stenosis at L5-S1." (*Id.* at 895-96.)

On July 2, 2021, Watts saw M. Gregory Barton, PA-C, after she was rearended in a Walmart parking lot while backing out. (*Id.* at 928.) Watts reported there was no damage to the vehicle, but she "had 'a terrible whiplash'" and was lightheaded. (*Id.*) Watts also complained of pressure on her right ear that went down the right side of her neck, and it was hard for her to turn right. (*Id.*) Watts denied numbness and tingling, as well as any other pain except for "chronic" back pain. (*Id.*) Barton noted Watts walked to the examination room without difficulty. (*Id.* at 930.) Barton performed "[m]yofascial release to tender trigger points" on the right side of Watts' neck "with significant improvement in pain and range of motion." (*Id.*) Barton found no neurologic deficits on examination. (*Id.*) Watts' diagnoses consisted of lightheadedness and mild cervicalgia. (*Id.*) Barton noted that Watts' initial blood pressure "was extremely high" and that he thought Watts "was stressed by walking to the building." (*Id.*)

On September 3, 2021, Watts underwent an interlaminar epidural steroid injection. (*Id.* at 902-03.)

On September 10, 2021, Watts saw Dennis Davis V, D.O., for complaints of pain, painful movement, and stiffness in her right hand. (*Id.* at 630.) Watts reported that the pain radiated to her right forearm. (*Id.*) Her symptoms began two months earlier after she fell on her outstretched right hand. (*Id.*) Watts rated her

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. In addition, since Watts challenges only the ALJ's physical findings, the Court further limits its discussion of the evidence to Watts' physical impairments.

pain as a 6/10. (*Id.*) On examination, Dr. Davis found tenderness along the palmer aspect of the right hand, "mainly in its third and fourth fingers and mid hand region," "ropiness of the soft tissue in that region," and pain with hand grip. (*Id.* at 631.) X-rays taken when Watts first fell showed no fractures. (*Id.*) Dr. Davis diagnosed Watts with "right hand pain-flexor tendinitis" and directed Watts to apply moist heat two to three times a day and continue taking Diclofenac. (*Id.*) He also told Watts to use a topical rub twice a day and a fiberglass hand splint at bedtime. (*Id.*)

On September 15, 2021, Watts saw Kermit Fox III, M.D., for worsening pain in her neck and right upper trapezius. (*Id.* at 893.) Dr. Fox noted Watts had gone to the emergency room the night before and it was noted that she had muscle spasms. (*Id.*) Watts also complained of burning pain in her feet, as well as her feet turning blue at times. (*Id.* at 894.) Watts described her pain as constant and rated it as an 8/10. (*Id.*) Standing for more than fifteen minutes worsened her low back pain, while sitting and warm showers alleviated it. (*Id.*) On examination, Dr. Fox found intact sensation, normal muscle tone, normal strength, and normal range of motion of the upper extremities, as well as increased reflexes of the biceps, triceps, and brachioradialis and "concordant tenderness in the cervical paraspinals." (*Id.* at 897.) Dr. Fox further found decreased sensation to light touch in the bilateral lower extremities, normal muscle tone and strength, increased reflexes of the patellar and the Achilles, "concordant tenderness in the lumbosacral paraspinals," and a 50% decrease in spinal range of motion with no pain at the end range of flexion and extension. (*Id.* at 898.) Watts' diagnoses consisted of radiculopathy of the lumbar region, lumbar spondylosis, spondylolisthesis of the lumbar region, cervical spondylosis without myelopathy, and spinal stenosis of the cervical region. (*Id.*) Dr. Fox recommended an interlaminar epidural steroid injection at L5-S1, and Watts agreed to proceed. (*Id.*) Dr. Fox also continued Voltaren as needed and increased Zanaflex. (*Id.*)

On January 25, 2022, Watts saw Lisa Prebish, NP, for follow up after a caudal injection and reported that her pain had decreased by 85%. (*Id.* at 1353, 1355.) Watts told Prebish she was "doing much better

and moving much better." (*Id.* at 1353.) On examination, Prebish found an antalgic gait and continued but improved positive bilateral lumbar facet loading, lumbar paraspinal muscle tenderness, and limited lumbar range of motion. (*Id.* at 1354.) Watts' diagnoses included degeneration of lumbosacral intervertebral disc, lumbosacral spondylosis, lumbosacral radiculopathy, and arthropathy of lumbar facet. (*Id.*)

On March 16, 2022, Watts saw Dr. Davis for follow up and reported numbness and pain in her right arm that radiated to her thumb and index finger. (*Id.* at 595.) Watts stated that she frequently felt like her right arm was asleep, and she experienced a "pins-and-needles feeling" that went down her forearm and into her hand and thumb. (*Id.*) Watts endorsed difficulty with fine motor activities and hand grip, as well as thumb twitching. (*Id.*) On examination, Dr. Davis found "no significant restriction" in the range of motion of Watts' right shoulder, elbow, wrist, or hand. (*Id.* at 597.) Vibration testing revealed decreased sensation along the radial nerve distribution on the right. (*Id.*) Dr. Davis ordered a physical therapy evaluation and an EMG with a nerve conduction velocity test. (*Id.*) Dr. Davis directed Watts to continue alternating moist heat and ice as needed. (*Id.*)

On April 4, 2022, an EMG of the upper extremity showed severe right median neuropathy consistent with carpal tunnel syndrome. (*Id.* at 590-91.)

On May 13, 2022, Watts underwent carpal tunnel release surgery on the right. (*Id.* at 860.)

On May 26, 2022, Watts saw Bradley Pierce, M.D., for a 13-day post-operative appointment following her right carpal tunnel release surgery and reported she had been washing dishes. (*Id.* at 523.) Dr. Pierce removed the sutures and instructed Watts not to immerse her hand in water for 72 hours. (*Id.*) On examination, Dr. Pierce found Watts "doing quite well" with "[m]ild and appropriate soreness in the palm." (*Id.*)

On October 18, 2022, Watts saw NP Prebish for follow up and reported a 75% improvement in her pain. (*Id.* at 1365, 1367.) Watts described her low back and hip pain as a "dull ache" and reported "some

pain" in her shoulder blades. (*Id.* at 1365.) On examination, Prebish found an antalgic gait, positive bilateral lumbar facet loading, lumbar paraspinal muscle tenderness, and limited range of motion of the lumbar spine due to pain. (*Id.* at 1366.)

On October 20, 2022, PA-C Barton wrote a letter stating that Watts was "not currently able to work" because of her "numerous chronic conditions." (*Id.* at 1633-34.)

On December 5, 2022, Watts saw NP Prebish for follow up of her bilateral hip pain. (*Id.* at 1371, 1373.) Watts reported that the pain in her neck was more soreness than pain and she wanted to discuss getting injections in her hips. (*Id.*) On examination, Prebish found an antalgic gait and improved but continued positive bilateral facet loading, lumbar paraspinal muscle tenderness, and limited lumbar range of motion. (*Id.* at 1372.) Prebish directed Watts to continue with PT and her home exercise program. (*Id.* at 1373.)

On December 9, 2022, Watts saw Dr. Davis for complaints of pain and painful movement in her bilateral knees and ankles. (*Id.* at 1598.) Watts rated her pain as a 5/10 with walking and standing. (*Id.*) Watts stated that her pain was worse when she first got up in the morning, and while it improved a bit with activity, it worsened if she did too much standing or walking. (*Id.*) On examination, Dr. Davis found tenderness to palpation around the patella bilaterally, pain with patellar ballottement and translation, crepitus with active range of motion of the knees, and normal findings regarding the ankles. (*Id.* at 1599.) X-rays of the knees revealed bilateral degenerative changes with patellofemoral components. (*Id.* at 1599-1600.) Dr. Davis provided Watts with home exercises for patellar tracking and quadriceps strengthening and ordered lab work for sedimentation rate, ANA, and rheumatoid factor. (*Id.* at 1600.)

On December 22, 2022, PA-C Barton provided Watts with a prescription for a handicapped parking permit. (*Id.* at 1589.)

On March 14, 2023, Watts saw Adriane Teach, CNP, for medication management and reported pain in the lower back that radiated into her bilateral hips and down her right outer thigh. (*Id.* at 1377.) Watts told Teach she had fallen and "almost did a back flip in the shower" the other day. (*Id.*) She did not go to the emergency room because she said they would not do anything for her. (*Id.*) Watts reported she had not slept in three days, and she had no money to buy an ice pack. (*Id.*) Watts asked for something to help with her pain until her next caudal injection, which was in two weeks. (*Id.*) On examination, Teach found an antalgic gait, positive bilateral lumbar facet loading, lumbar paraspinal tenderness, limited range of motion of the lumbar spine, and bilateral rib tenderness that increased with deep breaths. (*Id.* at 1378.) Teach provided Watts with a temporary Percocet refill until her upcoming caudal injection. (*Id.*) \

On May 18, 2023, Watts saw CNP Teach for follow up and reported neck pain that radiated into her shoulder blades and down her spinal column. (*Id.* at 1383, 1385.) Watts stated that the pain in her neck into her right shoulder hurt the worst. (*Id.* at 1383.) Watts also complained of knee pain and back pain. (*Id.*) She told Teach she had gone to urgent care recently and was sent to the ER. (*Id.*) Watts reported walking more, although she hurt worse by the evening. (*Id.*) On examination, Teach found an antalgic gait with no assistive device, positive bilateral lumbar facet loading, improved but continued lumbar paraspinal muscle tenderness, and continued but improved limited lumbar range of motion. (*Id.* at 1384.) Teach noted that Watts would be scheduled for a right cervical medial branch block steroid injection at C3-C7. (*Id.* at 1385.)

On September 5, 2023, Watts saw Dr. Pierce for complaints of right-hand pain. (*Id.* at 2558.) Dr. Pierce noted Watts was 16 months post carpal tunnel release. (*Id.*) On examination, Dr. Pierce found "mildly positive Tinel's at the right elbow," "some mild limitations" of cervical range of motion but no pain, and positive Spurling's on the right. (*Id.*) Dr. Pierce thought it was possible that this was caused by

an ulnar nerve but thought it more likely that it was cervical in nature. (*Id.*) Dr. Pierce ordered an ultrasound of the medial elbow and imaging of the cervical spine. (*Id.*)

On October 11, 2023, Watts saw David Williams, PA-C, for evaluation of her spinal issues, including low back pain that radiated down the sides of her legs and buttocks to her knees, which Williams described as Watts' primary complaint. (*Id.* at 2525.) While Williams noted Watts had undergone recent carpal tunnel surgery and had been referred for evaluation of cervical issues, when Watts arrived at the appointment, "she indicated that she had primarily low back issues from her own symptom standpoint." (*Id.*) On examination, Williams found pain to palpation over the lumbosacral junction near the midline, negative seated straight leg raise test, no lower extremity strength deficits, normal sensation in the lower extremities, abnormal reflexes at multiple points that were "suggestive of myelopathy," diminished grip strength on the right, and sensory deficit in the right forearm involving the first and fifth digits. (*Id.* at 2526.) Williams noted that Watts moved "somewhat slowly" from sitting to standing and seemed "a little unsteady on her feet." (*Id.*) Watts used a rollator to get around. (*Id.*) Williams suspected cervical myelopathy and ordered a cervical MRI. (*Id.*) Williams referred Watts to physical therapy and directed her to continue her weight loss program. (*Id.*)

On November 7, 2023, Watts saw Brent Golias, PT, for a physical therapy evaluation. (*Id.* at 2480.) Watts rated her pain as a 3/10 that day and described it as intermittent. (*Id.* at 2482.) On examination, Golias found poor posture, tenderness of the paraspinals and spinous process on the right, impaired sensation at the anterior thighs bilaterally, limited range of motion of the lumbar spine, full strength of the bilateral lower extremities except for "possible L EHL weakness," positive straight leg raise test bilaterally, and an antalgic gait. (*Id.* at 2482-83.)

On January 30, 2024, Watts saw Ahmed Eighawy, D.O., for a rheumatological evaluation of her body aches and joint pain. (*Id.* at 2351.) Watts reported that most of her symptoms that day were in her

elbows and knees. (*Id.*) Wrist extension and supination worsened her elbow pain. (*Id.*) Prolonged sitting, standing, or climbing stairs worsened her knee pain. (*Id.*) She denied joint swelling and stiffness. (*Id.*) Watts endorsed numbness and tingling in her arms despite having carpal tunnel release surgery years ago. (*Id.*) On examination, Dr. Eighawy found no soft tissue tender points, full muscle strength, and normal bulk and tone. (*Id.* at 2358.) On examination of the bilateral upper extremities, Dr. Eighawy found full range of motion of the elbows, mild tenderness to palpation along the proximal common extensor tendon bilaterally that was worse with wrist extension and supination, full range of motion of the wrists, no pain with pronation or supination, no tenderness of the wrists, full range of motion of the hands, full grip strength, and no tenderness of the finger joints. (*Id.* at 2358-59.) On examination of the bilateral lower extremities, Dr. Eighawy found full range of motion in the knees, positive patellar crepitus and grind, and negative provocative examinations of the knees. (*Id.* at 2359.) Watts' diagnoses consisted of patellofemoral syndrome of both knees, numbness and tingling, lateral epicondylitis of both elbows, and diffuse pain. (*Id.*) Dr. Eighawy had a low suspicion of any rheumatic disease and thought Watts' patellofemoral syndrome and lateral epicondylitis would improve with physical and occupational therapy. (*Id.*) Dr. Eighawy noted that Watts wanted a referral to neurology for evaluation of her numbness and tingling. (*Id.*)

**C. State Agency Reports**

On August 18, 2022, Mehr Siddiqui, M.D., reviewed the file and opined that Watts could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 140, 142, 151, 153.) She could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.* at 141, 152.) She could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.*) She could frequently stoop, kneel, and crouch. (*Id.*) She could occasionally crawl. (*Id.*) Her ability to balance was unlimited. (*Id.*) She could frequently handle and finger

bilaterally, as she was status post carpal tunnel surgery. (*Id.*) She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., and all exposure to hazards. (*Id.* at 142, 153.)

On December 19, 2022, on reconsideration, James Cacchillo, M.D., affirmed Dr. Siddiqui's findings. (*Id.* at 162-63, 173-74.)

**D. Hearing Testimony**

During the March 6, 2025 hearing, Watts testified to the following:

- She still lives alone in a house. (*Id.* at 46.) She still drives using only her left hand. (*Id.*)

- She works part-time at Dollar General. (*Id.*) She has been working there for two months. (*Id.*) She works 10-12 hours a week. (*Id.*) She has called off eight times already. (*Id.*) She is scheduled 10-12 hours a week, but since she has called off eight times, she is working four hours a week. (*Id.* at 47.) She is still using a walker, and she uses it when she is at work. (*Id.* at 48.) The only thing she is good at is cleaning. (*Id.* at 51.) Sometimes she cannot even deal with her boss. (*Id.*) She was in an argument with her boss over text message the day of the hearing. (*Id.* at 51-52.)

- She worked at a gas station for 25 hours a week or less. (*Id.* at 48.) If she worked more than that, she got frustrated, cranky, and irritable, which caused her to argue with her coworkers. (*Id.* at 48-49.) She used her walker at that job as well. (*Id.* at 49.) She worked third shift, so she did not get many customers, but if they said something wrong to her or she took what they said the wrong way, she would get "rude" and "nasty." (*Id.* at 51.) She received a seven-day suspension for how she treated people. (*Id.* at 52.) She also received two or three write-ups. (*Id.*) She was fired from that job because of her trouble getting along with others. (*Id.*)

- When working at the gas station, she only used her left arm, so picking things up was difficult. (*Id.* at 54.) She dropped a lot of things and broke a couple of coffee pots. (*Id.*) She could not mop with both hands, so the morning shift had to mop. (*Id.*) She did basic dusting and cleaning. (*Id.*) She called off two to three times a month at that job. (*Id.*) She was allowed to sit on her rollator at that job, although they did not offer breaks. (*Id.*)

- The symptoms in her right hand remain the same as they were at the previous hearing. (*Id.* at 49.) She has been able to work part-time despite not being able to use her right hand effectively. (*Id.*) Her right hand tingles and she "can hardly hold anything." (*Id.* at 50.)

- She is trying to establish care with a pain management provider after changing primary care physicians. (*Id.* at 56.) Injections were "very helpful" for her pain. (*Id.*) Sometimes the pain relief lasted three weeks, sometimes it lasted six months. (*Id.*) The

pain relief lasted longer when she first started getting injections and then tapered off. (*Id.*)

- Her son comes over to help her with taking out the trash and getting mail. (*Id.* at 57.) He comes over once or twice a week. (*Id.*)

The ALJ found Watts had no past relevant work. (*Id.* at 58.) The ALJ then posed the following hypothetical question:

> I'd like you to consider a younger individual, with at least a high school education; no past work. Further, consider the individual is limited to a range of sedentary work, but would be unable to climb ladders, ropes, or scaffolds; could no more than occasionally climb ramps or stairs, stoop, crouch, kneel, or crawl. The individual must avoid all exposure to hazards, such as unprotected heights and dangerous, moving machinery, and who cannot operate a motor vehicle on a vocational basis. The individual must avoid concentrated exposure to pulmonary irritants, such as odors, fumes, dust, gases, and poorly ventilated areas. The individual can occasionally interact with others, including supervisors, co-workers, and the public. All interactions should be superficial in nature, meaning the individual cannot perform tasks involving arbitration, conflict resolution, or responsibility for the safety or welfare of others. Given those restrictions, would there be work in the national economy that that individual could perform?

(*Id.* at 58-59.)

The VE testified that the hypothetical individual would be able to perform representative jobs in the economy, such as ink printer, eyeglass frame assembler, and lens inserter. (*Id.* at 59.)

In response to questioning from Watts' counsel, the VE testified that limitations to occasional handling, fingering, and feeling on the right and frequent handling, fingering, and feeling on the left would eliminate unskilled sedentary jobs. (*Id.* at 61.)

Watts' counsel then added a limitation that the individual would need a rollator or walker to ambulate and balance while walking or standing and asked if it would change the VE's answers in any way. (*Id.*) The VE responded as follows:

> No. No, the sedentary jobs, I thought it was unique for the light jobs, but not for the sedentary. The rollator is – it would be the preferred, not the walker, because a rollator – actually, they would prefer the wheelchair. It's easier, you

> know, accommodations, but the rollator, now they're – you could seat on – you're seated on it, and so that could be performed for sedentary jobs.

(*Id.*) Watts' counsel asked if use of a rollator or wheelchair would be an accommodation, and the VE testified that it would be. (*Id.* at 62.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has

a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Watts was insured on the alleged disability onset date, May 24, 2022, and remained insured through December 31, 2025, the date last insured ("DLI"). (Tr. 17, 19.) Therefore, in order to be entitled to POD and DIB, Watts must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since May 24, 2022, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbosacral and cervical spine, obesity, bipolar disorder, major depressive disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined

> in 20 CFR 404.1567(a) and 416.967(a) except that she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She cannot work at unprotected heights or around moving mechanical parts and cannot operate a motor vehicle. She must avoid concentrated exposure to dust, odors, fumes, gases, and pulmonary irritants. The claimant can have occasional interactions with supervisors, co-workers, and the public. All interactions should be superficial in nature, meaning the individual cannot perform tasks involving arbitration, negotiation, conflict resolution, or responsibility for the safety or welfare of others.
>
> 6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).
>
> 7. The claimant was born on October **, 1979, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).
>
> 8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).
>
> 9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from May 24, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-30.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance;

it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Manipulative Limitations

As part of her sole assignment of error, Watts argues that the ALJ erred by finding her carpal tunnel syndrome to be a non-severe impairment "and thus not including any manipulative restrictions into the RFC determination." (Doc. No. 7 at 12.) Watts asserts that the record supports a finding that her carpal tunnel syndrome is severe and "causes work-related limitations with the right upper extremity." (*Id.*) Watts maintains that the ALJ's "brief analysis is flawed," as it relies on an office note dated a week after Watts' carpal tunnel syndrome "when her symptoms may have seemed to have improved." (*Id.*) Watts argues that the ALJ failed to discuss her testimony, as well as more recent evidence, which show that Watts continued to have "manipulative limitations." (*Id.* at 12-13.) Therefore, Watts asserts that the ALJ's findings are "contrary to the evidence" and the RFC lacks the support of substantial evidence. (*Id.* at 13.)

The Commissioner responds that Watts' Step Two challenge is "'legally irrelevant'" as the ALJ found at least one impairment to be severe, continued on through the sequential disability evaluation, and discussed Watts' carpal tunnel syndrome and "alleged manipulative limitations" in the RFC analysis. (Doc. No. 8 at 6) (citing *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020)). The Commissioner argues that substantial evidence supports the ALJ's RFC determination, and that the ALJ's findings regarding manipulative limitations were reasonable. (*Id.*) Therefore, the Commissioner asserts that the

Court should reject Watts' argument that the RFC was deficient for failing to include manipulative limitations. (*Id.* at 7.)

"Before an ALJ can find that an individual is disabled, the ALJ must find that the individual has a 'severe' impairment." *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *see also* 20 C.F.R. § 404.1520(a)(4)(ii).[4] "If the individual has at least one severe impairment, the ALJ will then assess how much work the individual can still do." *Id.; see also* 20 C.F.R. § 404.1520(a)(4)(iv). When making that assessment, "the ALJ must consider limitations and restrictions imposed by all of [the] individual's impairments, even those that are not severe." *Kirkland*, 528 F. App'x at 427 (citing *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007)) (internal quotation marks omitted). *See also* 20 C.F.R. § 404.1523; *Pompa v Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps."); *Draine v. Comm'r of Soc. Sec.*, No. 1:22-cv-1370, 2024 WL 1014030, at *16 (N.D. Ohio March 8, 2024) (citing *Pompa*). If the ALJ considers all the individual's impairments, the "failure to find additional severe impairments ... does not constitute reversible error." *Kirkland*, 528 F. App'x at 427 (citing *Fisk*, 253 F. App'x at 583) (brackets and internal quotation marks omitted). *See also Garris v. Comm'r of Soc. Sec.*, No. 3:11-cv-2538, 2013 WL 3990754, at *7 (N.D. Ohio Aug. 2, 2013) ("Any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error and 'legally irrelevant.'").

The RFC determination sets out an individual's work-related abilities despite his or her limitations *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any

---

[4] The regulations governing disability insurance benefits and social security income are the same. *See* 20 C.F.R. § 404.1501 *et seq.*; 20 C.F.R. § 416.901 *et seq.*; *see generally Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). For convenience, the Court cites these regulations interchangeably.

special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis);

*Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

At Step Two, the ALJ found several of Watts' impairments to be severe, including degenerative disc disease of the lumbosacral and cervical spine, but found her carpal tunnel syndrome to be non-severe:

> The claimant also alleges carpal tunnel, restrictive lung disease and supraventricular tachycardia. There is mention of restrictive lung disease per 2021 spirometry (C4F/45), yet she reports smoking a pack of cigarettes a day (C15F/13), and she denies any chest pain or undue shortness of breath with climbing a flight of stairs or walking up a hill (C4F/45). She has had issues with supraventricular tachycardia, but she is noted to be asymptomatic (C4F/45). **EMG in April 2022 showed severe right and mild left carpal tunnel (C4F/57), and she underwent right carpal tunnel release on May 13, 2022 (C4F/47). At 2-week follow up she was doing quite well and was washing dishes, although she was advised not to immerse her wrist in liquid (C4F/35). She underwent left carpal tunnel release on June 15, 2022 (C4F/26). At 2-week follow up, she again reported she was washing dishes in soapy water, although she had been advised of no soaking of the operative hand. She also reported she was playing her grand piano for several hours per day without discomfort, and she had full strength and active range of motion in the hand and intact sensation (C4F/10). There is no indication of any ongoing functional limitations. Examination in April 2023 revealed intact sensation and negative Tinel's bilaterally (C16F/64).** Because the medical evidence demonstrates that these conditions impose no more than a minimal limitation on the claimant's ability to perform basic work activities and evidences that these conditions have improved or will improve within twelve months with treatment and/or medication, the undersigned finds

> these physical impairments nonsevere. All of the claimant's impairments, including those that are nonsevere, are included in the above residual functional capacity.

(Tr. 21) (emphasis added).

In the RFC analysis, the ALJ further found as follows:

> Similarly, the claimant's reported difficulties using her hands are not supported by the findings of treatment providers during the period of adjudication. In June 2022, she reported playing piano several hours per day just a month after her left carpal tunnel release. Further, there are no subsequent indications of manipulative difficulties or other functional limitations associated with carpal tunnel syndrome.

(Tr. 25.) The ALJ also noted that Watts "testified that she was working about 20 hours per week at a Dollar General Store, although she ha[d] apparently been terminated from this employment at some point following the remand hearing." (*Id.* at 27.)

Substantial evidence supports the ALJ's RFC findings. The ALJ considered Watts' carpal tunnel syndrome in the RFC analysis, and therefore any Step Two error is harmless. Contrary to Watts' argument, the ALJ considered her testimony regarding the limitations of her right hand and rejected those limitations based on evidence in the record. Also contrary to Watts' argument, the ALJ relied on more than one treatment record that shortly post-dated Watts' carpal tunnel release surgery in discounting Watts' subjective symptoms regarding her right hand.

Furthermore, other record evidence supports the ALJ's findings regarding Watts' use of her hands. At a examination on January 30, 2024, Dr. Eighawy found full muscle strength, normal bulk and tone, full range of motion of the elbows, full range of motion of the wrists, no pain with pronation or supination, full range of motion of the hands, full grip strength, and no tenderness. (*Id.* at 2358-59.) When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Williams v. Kijakazi*, 600 F.Supp.3d 852, 857 (W.D. Tenn. 2022) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Though Watts cites evidence that could support her allegations, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Castello v. Comm'r of Soc. Sec.,* 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011).

There is no reversible error.

**B. Assistive Device**

Watts argues that the ALJ also erred by failing to "include the need for a rollator or walker" in the RFC. (Doc. No. 7 at 13-14.) Watts attacks the ALJ's reasoning as to why the use of an assistive device was not necessary, as "[o]bservation of the use of the rollator by physicians is not required to support the use of or need for a rollator." (*Id.*) Watts asserts that the overall record supports the need for a rollator. (*Id.*) Watts also argues that the ALJ "fail[ed] to address that [Watts] was prescribed a handicap parking permit indicative of significant limitations with standing and walking" and which is "consistent with the need for a rollator." (*Id.*)

The Commissioner responds that the ALJ "specifically addressed" Watts' rollator usage and found it was not consistently noted at examinations in the record. (Doc. No. 8 at 7) (citing Tr. 25.) The Commissioner argues that, after weighing the evidence, the ALJ found that restricting Watts to sedentary work "would sufficiently account for [Watts'] walking difficulties." (*Id.* at 8.) The Commissioner asserts that because the ALJ's findings were reasonable and within the zone of choice, the ALJ's decision should be affirmed. (*Id.* at 7-8.)

The Court notes at the outset that both Watts and the Commissioner fail to mention, let alone discuss, the relevant Social Security Ruling regarding the use of assistive devices. SSR 96-9p states, in relevant part:

> **To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).** The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996) (emphasis added).

Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). Other courts in this district have noted that, in cases involving assistive devices, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p. *See, e.g., Bywater v. Comm'r of Soc. Sec.*, Case No. 5:25-CV-02170-SL, 2026 WL 2106606, at **11-12 (N.D. Ohio July 22, 2026), *report and recommendation adopted by* 2026 WL 2106606 (N.D. Ohio Aug. 6, 2026); *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019) (collecting cases).

Furthermore, as this Court has previously determined:

> [M]edical evidence that is simply consistent with the use of a cane is also insufficient. The fact remains that "[p]laintiff has not pointed to 'any medical documentation establishing that a cane is medically necessary or describing the circumstances for which it is needed, as SSR 96-[9p] requires.'" *Rodgers-Eaches v. Comm'r of Soc. Sec.*, No. 1:20-cv-69, 2021 WL 164254, at *7 (S.D. Ohio Jan. 19, 2021) (rejecting similar evidence of back impairment and ankle pain as insufficient to establish medical need for a cane) (quoting *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio

> Mar. 13, 2019), *report and recommendation adopted,* 2019 WL 3955407 (S.D. Ohio Aug. 22, 2019)). Absent medical documentation demonstrating need and the circumstances for which the cane was needed, the ALJ was not required to include the cane in his RFC analysis.

*Stupka v. Saul*, No. 1:19-CV-2305, 2021 WL 508298, at *4 (N.D. Ohio Feb. 11, 2021).

In the RFC analysis, the ALJ found as follows:

> The claimant alleges persistent reliance on a Rollator walker; however, use of an assistive device is not consistently noted by treatment providers. Furthermore, clinical indications as to the necessity of such a device are not regularly observed. While the claimant ambulates with an antalgic gait, there is no indication of motor or sensory deficits, and a restriction to sedentary exertion with postural limitations and no hazards properly addresses such gait issues.

(Tr. 25.)

Substantial evidence supports the ALJ's determination that an assistive device was not a medical necessity. While a doctor prescribed Watts a rollator, none of the records cited by Watts state that an assistive device is medically necessary, let alone set forth the circumstances in which it is necessary, as SSR 96-9p requires. Indeed, the treatment record Watts cites for her prescription for a rollator simply lists the diagnoses justifying the use of a rollator. (Tr. 631.) "The lack of showing required under SSR 96-9p is all the more pronounced given that the record is inconsistent, at best, as to [Watts'] use of and need for [a rollator]." *Stupka*, 2021 WL 508298, at *4. As the ALJ found, the evidence was mixed regarding Watts' use of rollator. The ALJ's failure to discuss that Watts was prescribed a handicap placard does not change the analysis, as "a doctor's recommendation or prescription that Plaintiff have a handicap parking placard does not satisfy the requirement of 'medical documentation.'" *Kowalske v. Comm'r of Soc. Sec.*, Case No. 2:21-cv-12627, 2022 WL 16833756, *2 (E.D. Mich. Nov. 9, 2022) (citing SSR 96-9p, 1996 WL 374185; *Schwartz v. Comm'r of Soc. Sec. Admin.*, No. 4:18-cv-12190, 2019 WL 3943863, at *6 (E.D. Mich. Aug. 1, 2019), *report and recommendation adopted by* 2019 WL 3936666 (E.D. Mich. Aug. 20, 2019)).

A perfect opinion is not required. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion

unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

"Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence. *See Jones*, 336 F.3d at 477 (even if substantial evidence supports a claimant's position, a court can't overturn the Commissioner's decision if substantial evidence supports the ALJ's conclusion)." *Garcia v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted by* 2023 WL 2330893 (N.D. Ohio Mar. 2, 2023). In sum, while there may be evidence supporting Watts' use of an assistive device, substantial evidence also supports the ALJ's RFC determination and its compliance with SSR 96-9p.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: September 8, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**